UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

DUCK MARITIME OF PANAMA,

         Plaintiff,

   - against -

LIBRA SHIPPING PTE. LTD. a/k/a
LIBRA SHIPPING PTE. LTD. OF SINGAPORE,.

         Defendant.

------------------------------------------------------X

## VERIFIED COMPLAINT

    Plaintiff, DUCK MARITIME OF PANAMA (hereinafter "Duck Maritime" or "Plaintiff"),

by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint

against the Defendant, LIBRA SHIPPING PTE. LTD. a/k/a LIBRA SHIPPING PTE. LTD. OF

SINGAPORE (hereinafter "Libra" or "Defendant") alleges, upon information and belief, as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the breach

of maritime contract of charter. This matter also arises under the Court's federal question

jurisdiction within the meaning of 28 United States § 1331.

    2.    At all times material to this action, Duck Maritime was, and still is, a foreign

corporation, or other business entity organized and existing under the laws of Panama.

    3.    Upon information and belief, Libra was, and still is, a foreign corporation, or other

business entity organized and existing under the laws of Singapore.

    4.    At all times material to this action, Duck Maritime was the owner of the motor ship

"DUCK FORTUNE" (hereinafter "the Vessel").

5.     By a charter party dated May 4, 2008 (hereinafter "the charter party"), Duck
Maritime time chartered the Vessel to Libra for a one time charter trip for the carriage of bulk maize
via East Coast India to West Malaysia/Vietnam range. *A copy of the charter party is attached
hereto as Exhibit "1".*

6.     Duck Maritime delivered the Vessel into the service of Libra and has at all times
fully performed its duties and obligations under the charter party.

7.     The charter party provided for hire payments at the rate of $18,750.00 per day,
payable every 15 days in advance, plus the value of bunker oil on board on delivery payable with
the first hire payment. *See Exhibit 1.*

8.     The first hire payment became due on May 16, 2008. Duck Maritime sent a first
hire statement to Libra on May 14, 2008 directing remittance of the first hire payment plus the value
of bunkers on delivery in the total amount of $572,228.20. *See First Hire Statement attached
hereto as Exhibit "2".*

9.     Against this outstanding balance due and owing on the first hire, Libra purported to
make various deductions from hire in contradiction to the terms of the charter party. *A copy of
Libra's statement of account is attached hereto as Exhibit "3".*

10.     As to the first hire statement, Libra provided Duck Maritime with a payment in the
amount of $493,679.91, leaving an outstanding amount due and owing under the terms of the
charter party of $78,548.29. *See Exhibit "2".*

11.     To date, Libra has withheld payment of $78,548.29 in breach of the terms of the
charter party.

12.     The second hire payment became due and payable on May 28, 2008. Duck Maritime
send Libra a second hire statement seeking remittance of hire in the amount of $281,250.00 plus the

balance of the first hire minus payments made by Libra and hire commissions, for a total due and

payable to Duck Maritime in the amount of $289,198.04.   To date, Libra has failed and/or refused

to pay any portion of the second hire payment due and owing to Duck Maritime.   *See Second Hire*

*Statement attached hereto as Exhibit "4".*

13.     On June 12, 2008, Duck Maritime sent Libra a third hire statement seeking hire

payment in the amount of $187,500.00 plus the balance of the first and second hire statements,

minus payments made by Libra and hire commissions, for a total amount due and payable to Libra

in the amount of $431,057.61.   To date, Libra has failed and/or refused to pay any portion of the

third hire payment due and owing to Duck Maritime.   *See Third Hire Statement attached hereto as*

*Exhibit "5".*

14.     Libra has breached the terms of the charter party by refusing and/or failing to pay

outstanding hire payments due and owing to Duck Maritime under the terms of the charter party.

15.     Pursuant to the charter party, disputes between the parties are to be submitted to

arbitration in London with English law to apply.   Duck Maritime is preparing to commence

arbitration against Libra.

16.     This action is brought in order to obtain jurisdiction over Libra and also to obtain

security for Duck Maritime's claims and in aid of contemplated London arbitration proceedings.

17.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party under

English Law.   Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of

these items as part of an award in favor of the prevailing party.

18.     As best as can now may be estimated, Plaintiff expects to recover the following

amounts at arbitration as the prevailing party:

    a.     Principal Claim – Outstanding hire:                    $431,057.61;

| b. | Interest for 2 years, compounded quarterly at 7% | $ 64,176.62; |
| c. | Estimated arbitration costs: | $ 21,000.00; |
| d. | Estimated recoverable legal fees and costs: | $130,000.00. |
| **Total:** | | **$646,234.23** |

19.     The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant. *See Affidavit in Support of Prayer for Maritime Attachment annexed hereto as Exhibit "6".*

20.     The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia,* any proeprty of the Defendant held by any garnishee within the District for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE,** Plaintiff prays:

A.     That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.     That pursuant to 9 U.S.C. §§ 201. *et seq.* and/or the doctrine of comity this Court recognize and confirm any foreign judgment or arbitration award rendered on the claims had herein as a Judgment of this Court;

C.     That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment

pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims,

attaching all tangible or intangible property of the Defendant within the District, including but not

limited to any funds held by any garnishee, which are due and owing to the Defendant, up to the

amount **$646,234.23** to secure the Plaintiff's claims, and that all persons claiming any interest in the

same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged

in the Complaint;

      D.     That this Court enter Judgment against Defendant on the claims set forth herein;

      E.     That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be initiated in

the future, including any appeals thereof;

      F.     That this Court award Plaintiff its attorney's fees and costs of this action; and

      G.     That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: June 13, 2008
      New York, NY

> The Plaintiff,
> DUCK MARITIME CORPORATION OF PANAMA
>
> By: *Anne C. Levasseur*
>
> Kevin J. Lennon
> Anne C. LeVasseur
> LENNON, MURPHY & LENNON, LLC
> 420 Lexington Ave., Suite 300
> New York, NY 10170
> (212) 490-6050 – phone
> (212) 490-6070 – fax
> kjl@lenmur.com
> acl@lenmur.com

NO. 0201    P. 9

## ATTORNEY'S VERIFICATION

State of Connecticut )
                     )    ss.:    Town of Southport.
County of Fairfield  )

1.    My name is Anne C. LeVasseur.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information and

belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents and/or

representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:        New York, NY
              June 13, 2008

                                        _Anne C. LeVasseur_
                                        Anne C. LeVasseur

# EXHIBIT 1

# Time Charter

GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913 — Amended October 20th, 1921; August 6th, 1931; October 3rd 1946

THIS CHARTER PARTY, made and concluded in ...Riga............................................. 04th .......... day of ...May,...... 19 2008

Between .DREKA MARITIMA CORP., Panama ...........................

Owners of the good ......... ( .Steamship / Motorship ) ... "DUCK FORTUNE" ... ............... of

of .13,792.............. .tons gross register, and ....9,085.........tons net register, having engines of .......................................... indicated horse power

and with hull, machinery and equipment in a thoroughly efficient state, and classed ...BUREAU VERITAS and will remain so for the duration of the voyage.....

at ............. .of about..29,730.1 cubic meter.............................. .cubic feet bale capacity, and about ..........22,535....metric...... tons of 2240 lbs.

deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding two and one-half present of ship's deadweight capacity,

allowing a minimum of fifty tons) on a draft of 9.871meters ..feet....... ...inches on .......summer freeboard, inclusive of ship's permanent bunkers,

which are of the capacity of about ... tons of .... .fuel, and ...........capable of steaming, fully laden, under good weather

condition about.....................knots on a consumption of about ....tons of ..best and ....capable of ...best grade fuel oil best grade Diesel oil

now discharging at Cigading, Indonesia...................................

LIBRA SHIPPING PTE LTD, Charterers of the City of ...Singapore ......................and.......

Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

about one time charter trip via safe anchorage(s) safe berth(s) safe port(s), always afloat, always accessible Institute

Warranty Limits with lawful merchandise excluding harmful and/or dangerous and/or injurious cargoes, in Charterer's option, duration about 25/30 days with laycan below mentioned trading limits

Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

the fulfilment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Owners obligations hereunder.

Vessel to be placed at the disposal of the Charterers, at on dropping last outward sea pilot station 1 safe port Singapore at any time day/night Saturdays and Holidays included.

in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in Clause No. 6), an

the Charterers may direct. If such dock or place be not available, time to count as provided for in clause No. 5. Vessel on her delivery to be

ready to receive with clean swept holds and tight, staunch, strong and in every way fitted for service, having water ballast, cranes/winches and

donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the cranes winches at one and the same

time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

dise, including petroleum in proper containers, excluding ...see Clause 50........

(vessel .is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risks,

all necessary fittings and other requirements to be for account of Charterers) in such lawful trades, between safe port and/or ports in British North

America and/or United States of America and/or West Indies and/or Central America Sea, and/or Gulf of Mexico and/or

Mexico, and/or South America excluding See Clause 57.............................

and/or Africa, and/or Asia, and/or Tasmania and/or New Zealand, but excluding Magellan's River, River St. Lawrence between

October 31th and May 15th, Hudson Bay and all trades not of season, White Sea, Black Sea and the Baltic,

32. ....................

33. ....................

34. ....................

35. ....................

36. esthcChartursorder?AgretsbwllidccccnbcbFullswingconditions:

37. 1. That for Owners of the rends band pay for all provisions wages and consular shipping &c off the Crews bit Pay for the

38. insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including *drinking water, lubricating oil and garbage*

39. thevessel *will allRegulationcertificatesnecessary to complywith slaim ergtimenewat the port of call asmet insalnrangaidy efficsr*

40. doesholwwaterandmaintain herclen and keep

41. 2. That whilst on hire the Owners shall provide and pay for all the fuel except as otherwise agreed Port Charges, *compulsory Pilotages, Agencies for clearance into cargo purpose*

42. only, Commissions,

43. Consular Charges (except those pertaining to the Crow, *Vessel's flag*) and all other usual expenses except those before stated, but when the vessel puts into

44. a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigation ordered because of

45. illness of the crew *or cargoes carried prior in delivery* to be for Owners account. Fumigation ordered because of cargoes carried or ports visited while vessel is employed under

46. charter to be for Charterers account. All other fumigation to be for Charterers account after vessel has been on charter for a continuous period

47. ofsickvesselswenxwws

48. Charterers are to provide necessary dunnage and shifting boards, *and any lashing/securing material* also any extra fittings requisite for a special trade or unusual cargo, but

49. Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

50. fordunnage,theymakegoodanydamagethereto.

51. 3. That the Charterers of the port of delivery and the Owners, at the port of delivery shall take over and pay for all fuel remaining on

52. board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ...tons and not more than

53. sieees on .... .... .... dunnage freeboard, per Calendar Month, commencing on and from the *time day* of her delivery, as aforesaid, and at

54. and after the same rate for any part of a day month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55. wear and tear excepted, to the Owners (unless lost) *as on dropping last outward sea pilot 1 safe port out of Singapore/Vietnam range*

56. of *any time day or night, Sundays and Holidays Included (incertion Hire/Holidays Rate Hours, Port Kelang)unless otherwise mutually agreed.* Charterers to give Owners and kai ften.... *18/75 .days*

57. *expressinforate until not less than 3,2,1 days definite*
notice of vessel's expected date of re-delivery, and probable *part going week, weather permitting except in unforeseen circumstances including factors thhablet to change in berthing turns at port of discharge,*
*action of the port authority and/or strike factors affecting hip working decided in matters and logo in matters of the cargo.*

58. 5. Payment of said hire to be made in *Cash in United States Currency, 15 days semi-weekly in advance, in advance, on first a before delivery See Clause 58.*

59. part of same the approximate amount of hire and should hire over the actual time, hire it it to to paid for the balance day by day or till become

60. due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61. hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62. ~~terein-without-prejudice-to-any-claim-they-(the-Owners)-(the-Owners)-may-otherwise-have-on-the-Charterers~~ Time to count from *delivery* 7-a.m.-on-the-working-day

63. ~~following-that-on-which-written-notice-of-readiness~~ has-been-given-to-Charterers-or-their-Agents-before-4-p.m.,-but-if-required-by-Charterers,-they

64. ~~shall-work-up-to-6-p.m.-if-required-by-Charterers-to-continue~~

65. Cash for vessel's ordinary disbursements at any port may be advanced by the Captain, subject to Owners prior approval by the Charterers or their Agents, subject

66. to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67. of such advances. *No ordinary Owners expenses to be advanced from hire payment, Master will prefer Owners expenses in cash at port of call by arrangement to arrange remittance to Agents directly*

68. 6. That the cargo or cargoes be laden and/or discharged in any dock or at any *safe* wharf or *safe place or safe anchorage* that Charterers or their Agents may

69. direct, provided the vessel can safely lie always afloat at any time ~~of-tide,~~ except at such places where it is customary for similar size vessels to safely

70. lie aground.

71. 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably slow and carry), also

72. accommodations-for-Supercargo,-if-carried,-shall-be-at-the-Charterers'-disposal,-reserving-only-proper-and-sufficient-space-for-Ship's-officers,-crew,

73. tackle,-apparel,-furniture,-provisions,-stores-and-fuel.-Charterers-have-the-privilege-of-passengers-as-far-as-accommodations-allow,-Charterers

74. paying-Owners-~~US$-10.--~~-per-day-per-passenger-for-accommodations-and-meals.-However,-it-is-agreed-that-in-case-any-fines-or-extra-expenses-are

75. incurred in consequence of the carriage of passengers, Charterers to bear such risk and expense. *No passengers to be allowed, no supercargo allowed during the voyage, only for maintaining loading/discharge operations without accommodation.*

76. 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance *to secure, lash, tally and discharge* with ship's crew and

77. boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78. agency; and Charterers are to load, stow and trim and tally the cargo *at their expense under the supervision and responsibility of the Captain who is to sign Bills of Lading for*

79. cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *If rejected to do so by Charterers Master or authorized Charterers agent at such ports to sign and issue Bills of Lading in conformity with Mate's receipt.*

80. 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81. receiving particulars of the complaint, investigate the same, and if necessary, make a change in the appointments.

82. 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany-the vessel and see that voyages are prosecuted

83. with the utmost despatch. He-is-to-be-furnished-with-free-accommodation,-and-same-fare-as-provided-for-Captain's-table. Charterers-paying-at-the

84. rate-of-$1.00-per-day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85. Clerks, Stevedore's, Foremen etc., Charterers paying *USD 1,500. lumpsum for victualling/watchman/entertainment at a reasonable rate. See Clause 01.*

86. 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87. Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88. terers, *their Agents or Supercargo, when required, with a true copy of daily Logs, in English, showing the course of the vessel and distance run and the con-*

89. sumption of fuel.

90. (2.) That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel not to ventilate in this trade.*

91. 13. That the Charterers shall have the option of continuing this charter for a further period of

92. ................................................................................................

93. on giving written notice thereof to the Owners or their Agents .........days, previous to the expiration of the first-named term, or any delivered option.

94. 14. That if required by Charterers, time not to commence before 00:00 hours local time *07th May 2008*...................... and should vessel

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled in London, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of York-Antwerp Rules 1994 and any subsequent amendments thereto 1924, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such event, and in such United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Hire not to contribute to General Average.

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

Jun. 13. 2008  3:41PM   Lennon, Murphy & Lennon LLC                    No. 5201   P. 13

168. drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169. port or to get out or to bring or take off the cargo after having got in.

170. 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

171. navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.

172. 27. A commission of 2.5 percent is payable by the Vessel's to Owners to *Famous Shipbroking Prime Limited, India*

173. *and 1.25 percent to M.F.R. (VSM) ship. Rigu.....................................................................*

173. on hire cancelled out paid under this Charter, and also any amount due under this extension of this Charter.

174. 

175. 28. An address commission of 2.5 3.75 per cent payable to ...*Charterers.*...... on the hire earned and paid under this Charter.

Class.....*29.to....91.*.......the vessel as stated hereto, and shall be able to fully incorporated in this charter party.

FOR OWNERS:

FOR CHARTERERS:

M/V. DUCK FORTUNE

ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04ᵀᴴ MAY 2008

### 29. CAPACITY PLAN

Prior to delivery of the vessel in Charter, Owners to provide Charterers, if required, with copies of the vessel's capacity plan and deadweight scales.

### 30. STOWAGE

Vessel's stowage plans to be made under Master's supervision. Owners warrant that Master will cooperate with Charterers and/or their Shippers in every way possible to load and stow the maximum quantity of Charterers intended cargo, according to normal custom of the port and type of cargo to the vessel's capacity always bearing in mind safety of the ship.

### 31. PORT REGULATIONS/CERTIFICATION

Owners warrant that the vessel is eligible for trading within charter party trading limits. Owners are obliged to deliver and keep the vessel, her Crew and anything pertaining hereto supplied with upto date and complete certificates, approvals, and equipment, enabling the vessel and her crew to carry the cargoes under this Charter Party.

It is the responsibility of the Master and Owners to arrange to keep on board all corresponding valid certificates, including but not limited to trading certificates, to the satisfaction of the concerned authorities required for the compliance with regulations, whether by law, custom or practice whatsoever in force at the ports of call and sailing waters, prior and during the stay at such ports and in such waters. Any time lost and any additional expenses/cost incurred or wasted in waiting for such certificates and/or lost by Owners non-compliance of such regulations, laws custom or practice, whatsoever, are to be deducted from hire.

Master to provide valid deratization certificate or equivalent, otherwise time lost for obtaining same to be for Owners account.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or pilotage assistance because of the vessel/owner's inability to meet requirements/regulations of port(s) of call and/or the vessel's ownership or management or the wages or conditions of employment of her officers and/or crew, hire shall cease for the time thereby lost. Owners warrant that the vessel is not blacklisted by any country, union and/or organization within charter party trading limits. The performing vessel will be covered by a bonafide Trade union agreement. Should the vessel be boycotted, picketed blacklisted or similar incident at any port or place by the shore and/or port labour and/or tugboats and/or pilots or due to Government restrictions or any authority either by reason of the vessel's flag or terms and conditions of which the members of the crew/officers are employed, of this vessel or any other vessel under the same ownership, or control, all consequences and any extra expenses incurred there from to be for owners account and Charterers are entitled to put the vessel off hire for any time lost by such reasons. The payment or hire shall cease for the time thereby lost. The vessels gear, equipment and hold ladders shall at any time be in good working order and comply with regulations in force in the countries of call. Any time lost by non-compliance of this shall be deducted from hire and any proved expenses directly related to the vessel thereby incurred shall be for account of Owners.

### 32. BIMCO OIL POLLUTION CHARTER PARTY CLAUSE

(1) Owners warrant that throughout the currency of this charter they will provide the vessel with the following certificates:

1

## M/V. DUCK FORTUNE

## ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04TH MAY 2008

Certificates issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the owners may be required to deliver the vessel into the charter), so long as these can be obtained by the owners from or by (identify the applicable scheme or schemes).

(2) Notwithstanding anything whether printed or typed herein to the contrary,

(a) save as required for compliance with paragraph (1) hereof, owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.

(b) Charterers shall indemnify owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which charterers and/or the holders of any bill of lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(3) Charterers warrant that the terms of this clause will be incorporated effectively into any bill of lading issued pursuant to this charter.

### 33.  BUNKER CLAUSE

Vessel to be delivered with about 300 (three hundreds) metric tons Intermediate Fuel Oil 120 CST (RME 25) and about 90 (ninety) metric tons MGO (DMA).

Vessel to be redelivered with same quantity as actually on board on delivery and same prices.

Prices both ends to be: US$ 653.00 - per metric ton for Intermediate Fuel Oil and US$ 1075.00-per metric ton MGO.

Bunker quantity on delivery estimated on basis vessel's consumption from Singapore via Kakinada to Port Kelang/Penang/Butterworth range – where Charterers intend to redeliver the vessel, with safety margin. In case Charterers take the vessel for discharge in Vietnam, Charterers are responsible to bunker at Singapore in order to safely reach Vietnam and redeliver the vessel with same quantity as on delivery.

On/off hire bunker surveys, if any, to be for Charterers expenses and conducted whilst vessel is on hire. Master/Chief engineer to act as Owners representatives.

Owners have the privilege to bunker the vessel for their own account prior to redelivery, provided this does not interfere with Charterer's operation, and such time taken for Owners bunkers to be for Owners account.

2

# M/V. DUCK FORTUNE

## ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04ᵀᴴ MAY 2008

### 34. OWNERS P AND I

Owners guarantee that the vessel is entered for full cover and shall remain entered for the duration of this Charter with a recognized protection and Indemnity Association. Cargo claims if any to be settled in accordance with NYPE Inter Club Agreement latest edition.

Notwithstanding anything that may be contained in this charter to the contrary it is expressly agreed that owners shall remain responsible for and indemnify Charterers against all claims arising in connection with loss of life, personal injury or similar claims limited only in respect of employment of crew/officers/Master.

Charterers P&I Club for this trip is "Steamship Mutual, London".

### 35. VESSEL PUT BACK

Should the vessel be put back whilst on voyage under this time charter for any reason whatsoever including but not limited to an accident or breakdown or in the event of loss of time either in port or at sea or deviation from the course of the voyage caused by sickness of or accident to the crew or any person on board the vessel or by reason of the refusal of Master or crew to perform their duties, the hire shall be suspended form the time of the inefficiency until the vessel is again efficient and voyage resumed, and all extra expenses, whatsoever, incurred including bunkers consumed during the period of suspended hire shall be for Owners account. Owners to keep Charterers informed regularly during any such 'off hire' period of expected time of completion of repairs and vessel's re-entry into the time charter.

If due to repairs of any part of her hull, machinery or equipment the vessel is estimated to remain off-hire for more than thirty consecutive days, the Charterers have the option of canceling the balance of this time charter, after arrangements have been made and effected for the delivery of any cargo on board the vessel.

If the vessel is stopped at sea for any repairs or the vessel is immobilised affecting Charterers loading/discharging obligations, all such stoppages and periods of immobilisation to be treated as off-hire.

### 36. HOLD CLEANLINESS

Prior the currency of the Charter the Crew to keep vessel's holds clean, dry and odourless, free from rust and rust scales and in every manner suitable to load the intended cargo to the satisfaction of independent surveyor appointed by Charterers / shippers. In the event vessel fails the inspection by said surveyor, vessel to be off-hire for the holds rejected on pro-rata basis from the time of such rejection till she passes the inspection.

Charterers confirm no special requirement to the vessel as to cargo is feeding one. Charterers agree that the vessel will not be cancelled failing inspection of the holds but to give Owners a time to prepare holds if necessary at Owners time and expenses.

Should vessels holds contain any live infestation on delivery then cost of fumigation and all expenses incurred including Crew expenses to be for Owners account and the vessel to be off-hire from the time of arrival till vessel is passed. However, should Charterers decide to fumigate the vessel despite live infestation being absent then time/cost of such fumigation to be on Charterers account.

# M/V. DUCK FORTUNE

## ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04TH MAY 2008

Charterers have the option to redeliver the vessel with clean swept, washed, dried holds and hatches as was delivered to Master satisfaction or paying on redelivery USD 2500 (US dollars two thousand five hundred only) lumpsum in lieu of holds cleaning, all inclusive.

### 37.  ARAB BLACKLIST

Owners warrant that the vessel is not Israeli owned nor under Israeli flag, will not call at or pass through Israeli ports during the voyage and is eligible to enter and trade all Arab ports. If required by Charterers the Master to issue a letter confirming the above mentioned.

Owners guarantee that the neither Owners nor the vessel is in any way directly or indirectly controlled by or related to Libyan, Nicaraguan, Cuban, Kampuchean, North Korean interests

### 38.  PERFORMANCE CLAUSE

The performance levels declared by the owners in the relevant negotiations with regard to any part of her hull, machinery including cargo gear and other equipment which are required to be in the service of the Charterers shall be diligently maintained by the owners throughout the period of the vessels service with the Charterers. If Charterers have reason to be dissatisfied with the performance of the vessel, the owners, on receiving complaint, shall immediately investigate and take appropriate steps to correct the situation.

Charterers or their supercargo to have free access to cargo holds.

Lashing materials, stanchions, if any, as on board to be placed at Charterers' disposal and Charterers to have free use of all equipment on board

Owners guarantee that the vessel is fully Hull and Machinery at a value of US$ 9.4 million and will remain so for the duration of this voyage. Vessel's H. & M. Underwriters are: Ingosstrakh Insurance Company.

Owners guarantee that the vessels grain/bale cubic on delivery will be clean, usable and unobstructed to load the cargo.

The vessel to be suitable for grab discharge and no cargo to be loaded in places inaccessible for normal grab-discharge/bulldozer assistance or in deep tanks for any reason attributable to vessel including vessels' stability or trim. If Owners/Master still insist, any time lost owing to cargo being loaded in such inaccessible places to be considered off-hire and any additional discharging costs to be for Owners' account. Charterers privilege to use bulldozers in the holds but always in accordance with vessel's tank-top strength.

### 39. STEVEDORE DAMAGE CLAUSE

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damages to the vessel caused by stevedores provided the Master has notified the Charterers and/or their agents in writing as soon as practical but not later than 48 hrs after the damage is discovered. Such notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such damage.

(a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed and if required passed by the vessel's classification society.

4

CCHNON,  HOTP.SY & LOTNON LLO                                          NO. 020!   P. 21

## M/V. DUCK FORTUNE

## ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04TH MAY 2008

(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterer's option, before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the Owners' work.

### 40.  VESSELS' SERVICE

The vessel to work night and day and/or weekends/holidays if required by the Charterers. Furthermore it is mutually understood that the Master and crew shall without extra compensation render every service using all strength and ability for the advantage of the Charterers as if same were for owners, always provided that same is permitted by local/harbour regulations. All over time paid to Master, Officers, and Crew to be for Owners account. Hire is inclusive of officers and crew's overtime. Vessel is to provide and maintain sufficient electric light clusters as on board for cargo work at night.

The vessel's services to include, but not limited to, the following: - Docking and Undocking, Shifting and warping from one berth to another or alongside berths with the assistance of linesmen and / or tugs, if compulsory or necessitated by weather or the Local conditions; All expenses to be for Charterers' account.

Bunkering (connecting/disconnecting of hoses, if allowed by local regulations). Rigging, raising and lowering of derricks and/or cranes and grabs and preparation for loading and discharging operation.

Vessel's Crew to open and close hatches as required during loading/discharging operations provided same is not prohibited by local regulations.

Removing and placing of beams in preparation of loading and discharging. Officers supervising cargo operations on deck during loading and discharging, shore watchmen, if required by Owners, to be for Owners' account, but where compulsory to be for Charterers account.

If required, Shaping up hatches and gear as much as possible weather permitting prior to the arrival at loading and/or discharging port and/or places so that loading and/or discharging operation can commence immediately if weather permits

Lashing, unlashing and re-lashing deck cargoes as required between ports to be at Charterers expense but crew to render all necessary assistance. Preparing for sea Removing and disposal of dunnage. Gangway watchmen if required for Owners purpose to be for Owners account.

In so far relevant those tasks to be performed prior to vessel's arrival or announcement of work by Charterers, in order to prevent any delay in commencement of work. It is understood that some services may be prohibited at certain ports, in which cases the Master to comply with such regulations but will use his best diligence to perform some services outside the port, whenever possible. If shore labour to be used because of local regulations, same to be for Charterers' account.

### 41.  VESSELS GEAR

With reference to Clause 15 and 23, Owners warrant that the vessel's cranes are in good working condition and will operate efficiently, as per description, throughout the currency of this charter. In the event of a disabled crane(s), or inefficiency of the gear or insufficient power, as described, to operate crane(s), the vessel to be off-hired pro-rata basis for the period of such inefficiency, provided shifts/gangs are available for the crane(s) out of order. Any extra costs of

JUN. 15. 2008  10:42AM    LENNON, MURPHY & LENNON LLC                        NO. 5281    P. 11

## M/V. DUCK FORTUNE

### ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04TH MAY 2008

hiring shore cranes/gear, incurred by such crane trouble to be for Owners account. And vessel to remain on-hire.

### 42.  SIGNING OF BILLS OF LADING

Upon arrival at port of loading, Master to authorize, in writing, Charterers or their agents to sign & release Bills of Lading in strict conformity with Mate's receipt.

Only 'clean' Mates' receipt to be issued and Master not to clause any Mates' receipt. Master has the right to reject cargo which he feels would prejudice signing 'clean' Mates' receipt, however such rejection to be reasonable. In case of any dispute with respect to the cargo being 'clean', Charterers to appoint independent surveyor whose decision to be final and binding. Owners have the right to have their P. and I. Surveyor present during such survey.

Bills of Lading quantity to be determined by joint draft survey at the load port, with owners being represented by either their nominated Surveyor or Master. When of dispute vessel is to remain on-hire.

Well in advance before completion of loading Charterers are to provide the draft of Bills of lading or Mate's Receipt, as the case may be, for Owners approval. In case of any delay in non providing with such draft vessel to remain on hire and Charterers to be fully responsible for any consequences/time lost thereof.

Notwithstanding any Clause or term in this Charter Party, it is expressly agreed that Charterers or their Aagents have the right to issue Bills of Lading marked 'freight prepaid'.

Conwartime 1993, Both to Blame Collision Clause, New Jason Clause and Clause Paramount to apply and form part of the Charter party and also to be incorporated in all Bill(s) of Lading issued under this Charter.

CONGEN B/L 1994 Edition to be used, all terms/conditions including arbitration clause of this C/P to be incorporated in B/L. No linerbills, no waybills, no through, transshipment or combined Bills of Lading to be issued under this Charter Party.

### 43.  SWITCHING AND SPLITTING OF BILLS OF LADING

Charterers have the right to switch bills. Second instance Bills of Lading to be signed and released in Dubai /Singapore by Charterers or their nominated Agents in Dubai/Singapore. Charterers are to provide Owners with their Agents full style in advance. Owners have the option to nominate their own Agents/representatives to be presented on signing/releasing of 2nd set of Bills of Lading. This option Owners to declare 24 hours after Charterers notice of their wish to change Bills of Lading with nominated place/date/time and authorized company.

Owners to authorize Charterers or their nominated Agents to issue and release second set of Bills of Lading by fax. Such authority to be sent by Owners immediately upon Owners Agents at Dubai or Singapore or loading port receiving in their possession of the first instance set of Bills of. Lading from Charterers and same have been marked "null and void" duly cancelled.

Second instance bills to be in strict conformity with the first instance bills except for Shippers, Receivers and Notify party. Second instance bills to be split as required by Charterers. Charterers to indemnify Owners for all consequences of such switching and splitting of Bills of Lading with a faxed Letter of Indemnity in Owners P & I club format signed by Charterers only. Original of Letter of Indemnity to be sent to Owners Agents office by courier.

M/V. DUCK FORTUNE

## ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04TH MAY 2008

### 44. ARREST / DETENTION CLAUSE

Should the vessel be seized or detained or arrested or delayed by any authority or by legal process and proven to be Owners default, hire to be suspended from the time of her seizure or detention or arrest until the time of her release unless such proven seizure or detention or arrest/delay is occasioned by any personal act or omission or default of the Charterers or their agents or their servants. Any extra expenses incurred by and/or during above seizure or detention or arrest or delay to be for Owners' account, unless caused by Charterers or their agents or their servants.

### 45. ILLEGAL GOODS/SMUGGLING

Any delay, expenses and/or fines incurred on account of smuggling should be for Owners' account if proven that it is caused by the Officers and/or Crew, or shall be for Charterers' account if proven that it is caused by the Charterers' supercargo and/or their staff or Agents.

### 46. VESSESL DESCRIPTION. :

1. NAME/EX NAME/EX EX NAME:  DUCK FORTUNE/ HUA HUI/ HUADONG
2. TYPE : BULK CARRIER
3. CLASS: BULK CARRIER UNRESTRICTED NAVIGATION
   -VSL'S ICE CLASS : N/A
4. MAIN ENGINE: TYPE/BHP - IHI PIELSTICK 16PC-2V / 7900 BHP
5. NAME OF MASTER: SERGIY KRYZHANOVSKYY
6. OFFICIAL REG.NO.:  9972
7. IMO NO.: 7929334
8. OWNERS: DUCK MARITIME CORP., PANAMA CITY, REPUBLICK OF PANAMA
   MANAGERS: AQUASHIP LTD, RIGA
9. SINCE WHEN VSL IS UNDER PRESENT OWNERSHIP/MANAGEMENT : 24.01.2008
10. BUILT: ISHIKAWAJIMA-HARIMA HEAVY INDUSTRIE CO., TOKYO, JAPAN/.
    05.02.1981
11. FLAG, HOMEPORT : ST.VINCENT, KINGSTOWN
12. INTERNATIONAL GRT/NRT: 13792 / 9085
              SUEZ GRT/NRT: 14327.54 / 11885.01
           PANAMA GRT/NRT: 14767 / 12106
13. CALLSIGN : J8B3500
14. INMARSAT-C NO.437553820
15. LOA/BEAM - 164.33M/22.86M
16. LBP - 156.06M
17. DEPTH MOULDED - 13.56M
18. DWT/ DRAFT:
        TROPICAL             SUMMER             WINTER
     23,182MT ON 10.076M / 22,525MT ON 9.871M / 21,873MT ON 9.665M;
19. TPC/TPI ON SUMMER DRAFT - 32MT/CM - 80LT/IN
20. CONSTANT (EXCL FRESH WATER) - ABT 240MT
21. FRESH WATER CONSUMPTION - ABT 8MT
22. BUNKER CAPACITY: IFO 1000MT; MGO 160MT
23. WATER BALLAS TANK CAP. - 4084.8CBM
24. WATER BALLAST HOLD CAP. - 4399.3CBM
25. BALLASTING CAPACITY MT/PER HOUR - 200

7

## M/V. DUCK FORTUNE

## ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04ᵀᴴ MAY 2008

26. DEBALLASTING CAPACITY MT/PER HOUR - 200
27. FRESH WATER CAPACITY - 351MT
28. EVAPORATOR CAPACITY - ABT 5MT/PER DAY
29. NO. AND SIZE OF HATCHES - TOTAL 5:
    HOLD NO.1 - 14.4 X 12.5M
    HOLD NO.2 - 16.0 X 12.5M
    HOLD NO.3 - 9.6 X 12.5M
    HOLD NO.4 - 16.0 X 12.5M
    HOLD NO.5 - 16.0 X 12.5M
30. NO. AND SIZE OF HOLDS:
    HOLD NO.1 - 18.5 X 23.8M
    HOLD NO.2 - 21.2 X 24.7M
    HOLD NO.3 - 19.4 X 17.5M
    HOLD NO.4 - 21.2 X 24.7M
    HOLD NO.5 - 21.2 X 24.7M
31. TYPE OF HATCHCOVERS - MAC GREGOR
32. TANK TOP STRENTH IN MAIN HOLDS:
    HOLD NO.1 - 11.4 MT/SQM
    HOLD NO.2 - 13 MT/SQM
    HOLD NO.3 - 21.3 MT/SQM
    HOLD NO.4 - 13 MT/SQM
    HOLD NO.5 - 12.7 MT/SQM
33. HATCH/DECK STRENTH - 1.85/2.3 MT/SQM
34. VESSEL IS STRENGTHED FOR HEAVY CARGOS: YES
    HOLD NO.3 CAN BE EMPTY
35. DISTANCE WATER LINE TO TOP OF HATCH COAMINGS:
-IN STANDARD BALLAST CONDITION
  NO.1 H/C TOP-14.2M
  NO.2 H/C TOP-13.4M
  NO.3 H/C TOP-12.7M
  NO.4 H/C TOP-12.1M
  NO.5 H/C TOP-11.2M
-IN HEAVY BALLAST CONDITION
  NO.1 H/C TOP-11.9M
  NO.2 H/C TOP-11.4M
  NO.3 H/C TOP-11.0M
  NO.4 H/C TOP-10.6M
  NO.5 H/C TOP-10.1M
-IN FULLY LOADED CONDITION 4,929 MTRS
36. DISTANCE FROM MAIN DECK TO TOP OF HATCH COAMINGS:
    HOLD NO.1 - 0.8-2.0M
    HOLD NO.2 - 0.8-1.2M
    HOLDS 3,4,5 - 1.2M
37. DISTANCE FROM KEEL TO TOP OF MAST - 40.5M
38. GRAIN/BALE CAPACITY - TOTAL 30697.7 / 29730.1 CBM
BREAKDOWN BY HOLDS:

8

Jun. 13. 2008 10:42AM    Leaving Murphy & Gordon LLC    No. 9201    P. 23

## M/V. DUCK FORTUNE

### ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04TH MAY 2008

HOLD NO.1 - 5811.6/5565CBM
HOLD NO.2 - 7004.1/6774.1CBM
HOLD NO.3 - 4371.9/4351.9CBM
HOLD NO.4 - 6910.2/6680.2CBM
HOLD NO.5 - 6599.9/6358.9CBM

39. VESSEL FITTED WITH CO2: YES
    VENTILATION: NATURAL

40. AUSTRALIAN HOLDS LADDER FITTED: YES

41. CRANES SWL/POSITION:
    20 MT/HOLD NO.1
    20 MT/HOLD NO.2
    20 MT/HOLD NO.3
    20 MT/HOLD NO.4
    20 MT/HOLD NO.5

42. CRANES ABLE TO HANDLE GRABS: YES

43. OUTREACH OF CRANES: IN METERS FROM SHIP SIDE - 4.55M

44. HEIGHT FROM DECK TO UNDERSIDE OF CRANE PADSTL - 12.5M

45. VALUE DATE OF CERTIFICATES:
    - CLASSIFICATION - 06.08.2009
    - SAFETY CONSTR./EQUIPM. - 06.08.2009/06.08.2009
    - LOADLINE - 06.08.2009
    - RADIO - 06.08.2009
    - DERATIZATION - 28.07.2008

46. LAST SS - 06.08.04

47. NEXT SS - 06.08.09

48. LAST DD - 13.08.07

49. SPEED/CONSUMPTION:
ABT 11.5KTS ON ABT 17MT IFO 120 CST (RME 25) PLUS ABT 2.0MT MGO AT SEA
UNDER GOOD WEATHER CONDITION AND GOOD VISIBILITY.
CONSUMPTION IN PORT:
IDLE ABT 1.5MT MGO; OR WHEN CARGO GEAR WORKING ABT 2.5MT PER DAY
WHEN CARGO GEAR(S) WORKING ALWAYS USING MIN 2 GENERATORS IF BOILER
IS USED, ABT 1MT MGO IN ADDITION IS REQUIRED.

BUNKERS SUPPLIED BY CHARTERERS TO BE IN ACCORDANCE WITH STANDARD
ISO 8217:2005E FUELS REQUIREMENTS, IFO RME 120 CST AND MGO.

THE SPEED/CONSUMPTION AS DESCRIBED ARE GIVEN BASIS GOOD WEATHER
AND SEA CONDITIONS, SMOOTH SEAS, NO SWELL AND NO ADVERSE CURRENTS
AND UP TO MAX WIND FORCE BEAUFORT SCALE 4(FOUR)/DOUGLAS SEA STATE
3(THREE).

VESSEL CONSUMES MGO IN MAIN ENGINE WHILE MANEUVERING / NAVIGATING
IN SHALLOW WATERS, RIVERS, CANALS, CHANNELS, RESTRICTED/BUSY
WATERS, ENTERING/LEAVING PORTS, SHIFTING BETWEEN BERTHS, AND WHEN
MANOEUVRING IN/OUT OF PORTS.

## M/V. DUCK FORTUNE

## ADDITIONAL CLAUSES TO CHARTER PARTY DATED. 04TH MAY 2008

IN ANY CASE BIMCO MARPOL ANNEX VI BUNKER CLAUSE FOR TIME CHARTER
PARTIES TO APPLY.

ALL DETAILS GIVEN IN GOOD FAITH BUT "WOG"

-OWNERS: DUCK MARITIME CORP.,
GLOBAL BANK TOWER, 50TH STREET, 18TH
LEVEL, PANAMA CITY. PANAMA

-NO DISP OWENRS

-CHARTERERS:
LIBRA SHIPPING PTE LTD.,
REG ADD: 3 SHENTON WAY,
#19-03 SHENTON HOUSE
SINGAPORE 068805
TEL: 65 62252070 / FAX: 65 62252537

-BROKERS: FEARNLEYS SHIPBROKING PVT LIMITED., MUMBAI
TEL. : +91 22 40378184 / EMAIL: chartering@fearnleys.co.th

A) OWRS GUARANTEE THAT VSL IS CLASSED TO LLOYDS 100 A1 OR EQUIVALENT
AND WILL REMAIN SO FOR THE DURATION OF THIS VOYAGE. VLS CLASS: BV-
BUREAU VERITAS

B) OWRS GUARANTEE THAT VSL IS ENTERED WITH AND INSURED FOR ALL CARGO
RISK WITH A INTERNATIONAL GROUP PNI CLUB AND WILL REMIAN SO FOR THE
DURATION OF THIS VOYAGE AND THAT ALL CALLS, INCLUDE SUPPLEMENTARY
CALLS ARE FULLY PAID UP. OWNERS PNI CLUB: INGOSSTRAKH, MOSCOW

C) OWRS GUARANTEE THAT VSL IF FULLY H+M INSURED AT A VALUE OF USD
9.4 MIO MILLION AND WILL REMAIN SO FOR THE DURATION OF THIS VOYAGE.
H&W UW: INGOSSTRAKH, MOSCOW

D) OWRS GUARANTEE THAT ALL VSLS CERTIFICATES, INCLUDE GEAR
CERTIFICATES ARE VALID AND FULLY UP TO DATE AND OWRS ACCEPT TO
MAKE SAME AVAILABLE TO CHRTRS FOR INSPECTION, IF REQUESTED.
VESSEL ISM CERTIFIED. YES

E) OWRS GUARANTEE THAT VSL'S HOLDS ARE FREE OF ANY OBSTRUCTIONS
/BULKHEADS / STANCHIONS, AND THAT VSL IS IN EVERY WAY SUITABLE
TO SHIP/LOAD/DISCH THE INTENDED CARGO. YES

F)OWNERS GUARANTEE VESSEL IS TOTALY SUITABLE TO CARRY THE INTENDED
CARGO WITH SLACK HATCHES AND WITHOUT ANY BAGGING /STRAPPING
/SECURING. OK, BUT TO MASTER DISCRETION AND SEFETY REQUIREMENTS.

G) OWNERS GUARANTEE VESSEL ON THE DECK ONLY 2 SOCET 440 V 60 HZ 15 AMPS

H) OWRS GUARANTEE THAT VSL AND VSL'S GEAR IS SUITABLE FOR GRAB
LOAD AND DISCHARGE. YES

I) OWRS GUARANTEE THAT VSL'S CRANES HAVE A MINIMUM LIFTING
CAPACITY OF 20TS AS DESCRIBED AND ARE ABLE TO WORK SIMULTANEOUSLY

10

M/V. DUCK FORTUNE

## ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04TH MAY 2008

AND SERVE ALL HOLDS.

J) OWRS CNFM VSL HAS NO UNPUMPABLE OR PERMANANT BALLAST ON BOARD NEED TO RECHECK WITH MASTER, REVERTING TOMORROW.

K) VSL IS NOT DISPONENTLY OWNED AND ORIGINAL OWNERS ARE PERFORMING THE CHARTER. YES, CARRIER IS DUCK MARITIME CORP.

L) MASTERS STOW PLAN FOR CARGO LOADING AGRI PRODUCT IN BULK - INTN BULK MAIZE STOWAGE FACTOR 48/50' ABT

DF-9,71 DA-10.03 SW
HOLDS
1-4275 -100%
2-5153 -100%
3-1980 - SLACK 38%
4-5084 -100%
5-4856 -100%
TTL 21348 MT
DWT 22525

2. SF- 50
DF-9.72 DA-10.02 SW
HOLDS
1-4105 - 100%
2-4945 - 100%
3- 2758 - SLACK 10%
4- 4880 - 100%
5-4660 - 100%
TTL -21348 MT
DWT -22525

NO STRAPPING/BAGGING REQUIRED FOR ABOVE

M) VESSEL HAS NO OBSTRUCTIONS ON DECK OR SHIP'S SIDE ALLOWING CLEAR ACCESS FOR MOBLIE CRANES TO ALL HOLDS/HATCHES: YES

N) VSL HAS VALID GRAIN LOADING MANUAL AND GRAIN LOADING CERT APPROVED BY CLASS. ONRS TO ARRNGE ALL NECESSARY APPROVALS ARE RQRD AT THEIR COST AND TIME. YES.

## 47. OWNERS EXPENSES

Owners have option of using Charterer's agents to attend to vessel's normal requirements such as assisting in arranging fresh water and/or delivery and despatch of Crew mail, etc. without any additional agency fee to Owners actual expenditures being paid at cost by Owners against supporting vouchers. For any extra attendance such as repairs, repatriation, Crew hospitalization, delivery of spares etc. agency fee to be negotiated between Owners and agents.

## 48. ON-HIRE / OFF-HIRE SURVEY

On delivery Charterers have the option, at their time and expense, to make hose test on vessel's hatch covers. If any minor leakages found then Owners will arrange for ramnek tape at Owners time and expense.

11

Ven. IJ. zvoo IV.45mm    Lenron, marony & Lenron LLo                 No. 5201   P. 25

# M/V. DUCK FORTUNE

## ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04ᵀᴴ MAY 2008

49. Deleted.

### 50. INTENTED CARGO / CARGO EXCLUSIONS

All cargoes excluded except bulk maize / bulk soyabean meals / bulk rapeseed meal / bulk iron ore fine/lumpy / bulk castor seed meal / rice bran extraction. Charterers guarantee cargo to be harmless, non dangerous.

Owners confirm vessel have grain loading manual/booklet on board and vessel suitable to load bulk grain/maize.

Vessel has natural ventilation.

Cargo to be loaded in vessel's holds, carried and discharged according to IMO rules and always in respect with ship's loading manual. No loading of cargo on deck is allowed.

### 51. TAXES / DUES

Any taxes and/or dues of any kind on vessel freight and/or cargo to be for Charterers account.
Any taxes on vessel's flag/domicile to be for Owners account.

### 52. LIGHTERAGE CLAUSE

Charterers have the option to discharge into barges simultaneously with shore operation at berth or into barges only at safe anchorage with vessels gear/grabs barges will be equipped with suitable tyre fenders acceptable to Master which to be reasonable and in accordance with customary practice.

Lighterage required, if any, unless required for the fault of vessel/Owners, to be always on Charterers' time and account

Charterers who shall supply tyre fenders equivalent or better to Master up to Master's requirement and satisfaction and in accordance with customary practice, shall be liable for any damage to which either vessel may sustain during the approach, securing, lying alongside, unsecuring or departure of the lightening vessel(s)/craft and in the event of any damage being sustained. Final and sole responsibility for the placing of fenders shall however always remain with the respective Masters.

Master shall at all time give full co-operation to Charterers and/or their agent to expedite the discharge and shall, take all steps to protect their vessel and any other vessel/craft from sustaining damage.

### 53. RETURN INSURANCE PREMIUM

Charterers to have the benefit of any return insurance premium if received by Owners from Underwriters as and when received from Underwriters by reason of vessel being in port for minimum thirty days provided vessel is on hire.

### 54. DELIVERY / REDELIVERY TIME

Delivery and redelivery to be in G.M.T except the laycan which to be basis local time.

**M/V. DUCK FORTUNE**

## ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04TH MAY 2008

**55. WAR RISK BONUS**
Charterers have the option to trade vessel in war risk area subject Charterers paying extra and/or additional insurance premium charged by Owners Underwriters and any blocking/extra crew bonus to be for Charterers account. Trading to war risk areas always subject to Owners Underwriters prior approval which not to be unreasonably withheld.
Present war bonus to Captain, Officers and Crew and basic annual War Risks Insurance on vessel and/or Crew to be for Owners' account.   Any extra and/or additional War Insurance Premium charged by Owners' Underwriters by reason of vessels trading under this charter party to be for Charterers account and to be refunded to Owners by Charterers upon receipt of copies of Owners' Underwriters net invoices.    Any blocking/ trapping/detention insurance to be for Owners' account, and Crew War Bonuses as required by the vessel's flag and/or Seamen's Unions payable by reason of vessel trading under this Charter Party to be refunded to Owners by Charterers against documentation.

However increase as payable by Charterers not to exceed that which would have been charged if the vessel had been covered with Lloyd's of London for physical loss and/or damage to the vessel or Crew on equivalent terms and conditions to Owners own war risk cover.

Charterers to have the benefit of any discount granted to Owners by Underwriters. War zone to be determined by Lloyds of London.

**56. CHARTERERS' INSPECTION**
Deleted.

**57. TRADING EXCLUSIONS**
All countries are excluded except of India-Malaysia-Vietnam.

**58. HIRE PAYMENT / ANTI TECHNICALITY CLAUSE**
Hire to be paid every 15 days in advance within 3 (three) banking days to Owners' nominated bank after vessel's delivery and relevant fax/e-mail invoice via brokers' channel.

Hire and Bunkers to be paid to:

BNP PARIBAS SUISSE SA
2, PLACE DE HOLLANDE
CH – 1211 GENEVA
SWIFT: BPPBCHGG
USD ACCOUNT: 86311/1Z
IBAN: CH64 08686001 0863 1100 1
FAVOR: DUCK MARITIME CORP.

Hire to reach Owners nominated bank account net of any banking commissions / charges. On delivery Charterers to take over fuels remain on board and to remit it's value basis declared prices with first hire.
Final hire statement to be prepared and if found any funds excess paid to Owners same to be settled by Owners within 10 days of redelivery of the vessel to the Owners.

13

วนา เงา: 2006 เว:4วคต    Lennon, murphy & Lennon เเc    No. 0201    P. 30

## M/V. DUCK FORTUNE

### ADDITIONAL CLAUSES TO CHARTER PARTY DATED  04TH MAY 2008

Charterers are entitled to deduct from last hire installment the value of estimated quantities of Bunker on redelivery. No estimated Owners expenses to be deducted from hire payment, Master will pay for Owners expenses in cash at port of calling. Charter hire not to be contributed to GA.

Owners to arrange despatching/faxing the delivery certificate or Master's cable intimation upon vessel's delivery to Charterers' office.  Hire will be released only after receipt of delivery certificates or Master's cable intimation indicating, place, date and time of delivery and quantity of bunker on board.

Notwithstanding anything contained herein to the contrary, if at any time during the currency of this Charter hire shall become due on during weekends or national holiday or outside normal office hours or at any time which for reasons beyond their reasonable control prevents Charterers from effecting payment of hire on the due date, payment of hire may be made on the next banking day immediately following the date on which hire became due. Where there is any failure to make hire payment on the due date because of the an oversight or negligence or error or omission of Charterers' employees, bankers or agent or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners 3 (three) banking days notice to rectify the failure where so rectified the payment shall stand as punctual and regular payment.

#### 59. VESSELS SPEED.
Charterers to have the option to instruct the vessel to steam with decreased speed.

#### 60. FIXTURE TO BE STRICTLY PRIVATE AND CONFIDENTIAL
This fixture is to be kept strictly private and confidential.

#### 61. DRY DOCKING
Owners not to dry-dock the vessel during the currency of this charter party unless caused due emergency which to be on Owners' time and expense and if required by Charterers Owners to make arrangement for the delivery of cargo so loaded, prior to necessity of drydocking, to the original destination at their expense and time

#### 62. VESSELS' SALE
Owners warrant that the vessel will not be sold during the currency of this Charter.

#### 63. C/V/E
Charterers to pay lump-sum USD 1,500 per month or pro-rata for cables/entertainment including victualling.

#### 64. STEVEDORE CLAUSE
Charterers to have the privilege of using bulldozers/forklifts/grabs/other equipment in vessel's holds subject to vessel's deck strength limitation.

#### 65. ARBITRATION CLAUSE
This Charter Party and any disputes arising hereunder shall be governed by and construed in accordance with English Law, both as regards substance and procedure.

14

## M/V. DUCK FORTUNE

### ADDITIONAL CLAUSES TO CHARTER PARTY DATED 04ᵀᴴ MAY 2008

This Contract is governed by English Law and there shall apply to arbitration proceedings under this clause the terms of the London Maritime Arbitrators' Association current at the time when the arbitration proceedings are commenced. Any dispute arising under this charter to be referred to arbitration in London. One Arbitrator to be nominated by the owners and the other by the Charterers, and in case the Arbitrators shall not agree then to the decision of an umpire to be appointed by them. The award of the Arbitrators or the Umpire to be final and binding upon both parties. In accordance with the Arbitration act, of 1996, and subsequent amendments. If either of the acting arbitrator dies, the party who appointed him may appoint a new arbitrator in his place. If one party fails to appoint an Arbitrator, either originally or by way of substitution as aforesaid, for seven clear days after the other party, having appointed his Arbitrator, has served the party making default with notice to make the appointment, the party who has appointed an Arbitrator may appoint that Arbitrator to act as sole arbitrator in the reference and his award shall be binding on both parties as if he has been appointed by consent.

**LMAA CLAUSE :**
Notwithstanding anything to the contrary in this Charter party, the parties agree that all Arbitrations where the amount in issue in the disputes(s) is less than US DOLLARS 50,000. shall be conducted according to the Small Claims Procedure 1989 (S.C.P). of the London Maritime Arbitrators Association (as amended from time to time).

**66. DISCHARGE AND RELEASE OF CARGO**
Discharge allowed against original of Bills of Lading. Charterers will make every effort to ensure that original of Bills of Lading are tendered to Master upon vessel's arrival at discharge port(s).
In case original Bills of Lading will not be available at the discharge port(s), upon vessel's arrival, the Owners/Master to release cargo against Letter of Indemnity in Owners P&I Club wording signed by the Charterers. The LOI to be confirmed by Owners and sent to them via brokers by fax/e-mail "before breaking bulk". Charterers guarantee to return Original Bills of Lading to Owners as soon as possible when it becomes available. The original LOI together with attached copy of Bills of Lading and copy of manifest shall be forwarded to Owners by mail immediately upon ships arrival discharge port, Charterers agents to handover Master copy of LOI, copy of Bills of Lading for discharge smoothly.

**67. HATCH COVERS**
Owners guarantee that the vessel's hatchcovers are watertight upon delivery of the vessel in Charter.

**68. VESSELS' SPEED / CONSUMPTION**
Should Owners' details as entered in this Charter, for the vessels' speed, fuel consumption, draft, constants and deadweight cargo capacity, be proved discrepant from the vessel's actual performance, the hire payable under this Charter can be reduced proportionally, however, due consideration to be paid to prevailing weather conditions as agreed, and any excess fuel consumed to be for Owners' account. Vessels speed consumption to be monitored by Ocean Route or equivalent agency appointed by Charterers whose decision shall be final and binding on both parties.

Within the context of this Charter Party good weather conditions are understood to mean winds maximum Beaufort Force 4 and Douglas Sea State 3. Charterers may supply Ocean Routes' advise to the Master during the voyages specified by the Charterers. The Master to comply with the reporting procedure of the routing service

15